*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| NELSON KANUK, a minor, by and through his guardian, SHARON KANUK; ADI DAVIS, a minor, by and through her guardian, JULIE DAVIS; KATHERINE DOLMA, a minor, by and through her guardian, BRENDA DOLMA; ANANDA ROSE AHTAHKEE LANKARD, a minor, by and through her guardian, GLEN "DUNE" LANKARD; and AVERY and OWEN MOZEN, minors, by and through their guardian, HOWARD MOZEN, | Supreme Court No. S-14776 |
| | Superior Court No. 3AN-11-07474 CI |
| | O P I N I O N |
| | No. 6953 - September 12, 2014 |
| Appellants, | |
| v. | |
| STATE OF ALASKA, DEPARTMENT OF NATURAL RESOURCES, | |
| Appellee. | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Sen K. Tan, Judge.

Appearances: Brad D. De Noble, Eagle River, for Appellants. Seth M. Beausang, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee. Peter Van Tuyn, Rebecca L. Bernard, and Teresa B. Clemmer, Bessenyey & Van Tuyn, L.L.C.,

Anchorage, for Amici Curiae Law Professors. Gabriel W. Scott, Cordova, for Amicus Curiae Alaska Inter-Tribal Council.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

The appellants in this case are minors from communities across Alaska who claim that the State has violated its duties under the Alaska Constitution and the public trust doctrine by failing to take steps to protect the atmosphere in the face of significant and potentially disastrous climate change. The minors argue that the superior court erred when it dismissed their complaint on grounds that their claims were not justiciable — specifically, that the claims involved political questions best answered by other branches of state government. On that basis we affirm the dismissal of the claims asking the court to set specific standards for carbon dioxide emissions and to order the State to implement reductions in accordance with those standards.

The minors also sought a declaratory judgment on the nature of the State's duty to protect the atmosphere; the claims for declaratory relief do not present political questions. We nonetheless affirm their dismissal, because in the absence of justiciable claims for specific relief, a declaratory judgment will not settle the parties' controversy or otherwise provide them with clear guidance about the consequences of their future conduct.

## II.  FACTS AND PROCEEDINGS

In May 2011, six Alaskan children (the plaintiffs),[1] acting through their guardians, filed suit in the superior court against the State of Alaska, Department of Natural Resources, seeking declaratory and equitable relief.  The plaintiffs contended that the State breached "its public trust obligations [under] [a]rticle VIII of the Alaska Constitution" by failing "to protect the atmosphere from the effects of climate change and secure a future for Plaintiffs and Alaska's children."[2]  The plaintiffs alleged facts

---

[1]     The six plaintiffs are Nelson Kanuk of Kipnuk, 16 years old at the time suit was filed; Adi Davis and Katherine Dolma of Homer, both then 15; Ananda Rose Ahtahkee Lankard of Anchorage, then nearly one; and Avery Mozen and Owen Mozen of McCarthy and Anchorage, then 10 and 7, respectively.

[2]     Article VIII of the Alaska Constitution includes the following provisions relevant here:

> Section 1 – Statement of Policy
>
> It is the policy of the State to encourage the settlement of its land and the development of its resources by making them available for maximum use consistent with the public interest.
>
> Section 2 – General Authority
>
> The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people.
>
> Section 3 – Common Use
>
> Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.
>
> Section 4 – Sustained Yield
>
> Fish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed,

(continued...)

showing that each of them has been individually and directly harmed by climate change. They asked the superior court for a declaratory judgment holding (1) that "the atmosphere is a public trust resource under [a]rticle VIII," which (2) the State "has an affirmative fiduciary obligation to protect and preserve," and (3) that the State "has failed to uphold its fiduciary obligations." They also asked the court to declare that the parameters of the State's duty to protect the atmosphere are (4) "dictated by the best available science and that said science requires carbon dioxide emissions to peak in 2012 and be reduced by at least 6% each year until 2050," and (5) that the duty is "enforceable by citizen beneficiaries of the public trust." Finally, the plaintiffs asked the court to order the State (6) "to reduce the carbon dioxide emissions from Alaska by at least 6% per year from 2013 through at least 2050," and (7) "to prepare a full and accurate accounting of Alaska's current carbon dioxide emissions and to do so annually thereafter."

The State moved to dismiss the complaint under Alaska Civil Rules 12(b)(1) and 12(b)(6).[3] Following oral argument, the superior court issued a written decision holding that all the claims made in the complaint were non-justiciable and granting the motion to dismiss under Rule 12(b)(6). The plaintiffs filed this appeal.[4]

---

[2](...continued)
>
> and maintained on the sustained yield principle, subject to preferences among beneficial uses.

[3]    Rules 12(b)(1) and 12(b)(6), respectively, allow a defendant to assert by motion the defenses of "lack of jurisdiction over the subject matter" and "failure to state a claim upon which relief can be granted."

[4]    The parties presented their oral arguments to this court before an audience primarily of students at Barrow High School in Barrow, a community that has been labeled "ground zero for climate-change." Bob Reiss, *Barrow, Alaska: Ground Zero*

(continued...)

## III.    STANDARDS OF REVIEW

"We review a motion to dismiss de novo, construing the complaint liberally and accepting as true all factual allegations.  In reviewing a motion to dismiss, we do not consider materials outside the complaint and its attachments."[5]  "[M]otions to dismiss are disfavored," and before dismissal will be granted it must be "beyond doubt that the plaintiff can prove no set of facts that would entitle him or her to relief."[6]  "Even if the relief demanded is unavailable, the claim should not be dismissed as long as some relief might be available on the basis of the alleged facts."[7]  "We view the facts in the best light for the nonmovant . . . and draw all reasonable inferences in [that party's] favor."[8]

"Matters of constitutional . . . interpretation are questions of law, which we review de novo,"[9] "adopt[ing] the rule of law that is most persuasive in light of

---

[4](...continued)
*for Climate Change*, SMITHSONIAN MAGAZINE, Mar. 2010, *available at* http://www.smithsonianmag.com/science-nature/barrow-alaska-ground-zero-for-climate-change-7553696/?no-ist.

[5]      *Pedersen v. Blythe*, 292 P.3d 182, 184 (Alaska 2012) (footnote omitted) (citing *Larson v. State, Dep't of Corr.*, 284 P.3d 1, 7 (Alaska 2012); *Caudle v. Mendel*, 994 P.2d 372, 374 (Alaska 1999)).

[6]      *Adkins v. Stansel*, 204 P.3d 1031, 1033 (Alaska 2009) (quoting *Catholic Bishop of N. Alaska v. Does 1-6*, 141 P.3d 719, 722 (Alaska 2006)) (internal quotation marks omitted).

[7]      *Id.* (citing *Miller v. Johnson*, 370 P.2d 171, 172 (Alaska 1962)).

[8]      *Waiste v. State*, 10 P.3d 1141, 1144-45 (Alaska 2000).

[9]      *State, Dep't of Corr. v. Heisey*, 271 P.3d 1082, 1085 (Alaska 2012) (citing *Bradshaw v. State, Dep't of Admin., Div. of Motor Vehicles*, 224 P.3d 118, 122 (Alaska 2010)).

precedent, reason and policy."[10] Because we are "the ultimate arbiter" of issues such as standing, mootness, and ripeness, we review de novo the question of whether a case should be dismissed on prudential grounds.[11]

## IV. DISCUSSION

### A. The Plaintiffs Have Standing.

We first address the State's challenge to the plaintiffs' standing. A standing inquiry asks whether the plaintiff is "a proper party to request an adjudication of a particular issue."[12] We interpret the concept broadly in favor of "increased accessibility to judicial forums."[13]

#### 1. The plaintiffs have interest-injury standing.

We recognize two types of standing: interest-injury standing and citizen-taxpayer standing.[14] The plaintiffs here claim interest-injury standing, which means they must show a "sufficient personal stake in the outcome of the controversy to ensure the requisite adversity."[15] "[T]he degree of injury to interest need not be great: an

---

[10] *Id.* (quoting *Ruckle v. Anchorage Sch. Dist.*, 85 P.3d 1030, 1034 (Alaska 2004)) (internal quotation marks omitted).

[11] *State v. Am. Civil Liberties Union of Alaska*, 204 P.3d 364, 368 (Alaska 2009).

[12] *Trs. for Alaska v. State, Dep't of Natural Res.*, 736 P.2d 324, 327 (Alaska 1987) (quoting *Moore v. State*, 553 P.2d 8, 24 n.25 (Alaska 1976)) (internal quotation marks omitted).

[13] *Id.* (quoting *Moore*, 553 P.2d at 23) (citations and internal quotation marks omitted).

[14] *Larson v. State, Dep't of Corr.*, 284 P.3d 1, 12 (Alaska 2012).

[15] *Id.* (quoting *Kleven v. Yukon-Koyukuk Sch. Dist.*, 853 P.2d 518, 526 (Alaska 1993)) (internal quotation marks omitted).

identifiable trifle is enough for standing to fight out a question of principle."[16] "The affected interest may be economic or intangible, such as an aesthetic or environmental interest."[17]

The amended complaint in this case alleged injuries from climate change that were both specific and personal:

> 8.    Nelson [Kanuk] has been personally affected by climate change due to erosion from ice melt and flooding from increased temperatures. In December 2008, ice and water flooded the village, causing Nelson and his family as well as many others in his village to have to evacuate their homes. This erosion, flood, melting ice and increased temperatures threaten the foundation of Nelson's home, village, native traditions, food sources, culture, and annual subsistence hunts.
>
> . . . .
>
> 12.    . . . In [Adi Davis's] area, rising temperatures are especially important because of the Spruce Bark Beetle infestation. The higher summer temperatures allow more Spruce Bark Beetles to hatch and infest trees. This has caused the destruction of more than one million mature spruce trees on the Kenai Peninsula. This has led to a rise in forest fires in her area. Adi also fears that climate change will wipe out the polar bears before she has the chance to see them in the wild and cause glaciers to disappear before her

---

[16]    *Id.* (quoting *Bowers Office Prods., Inc. v. Univ. of Alaska*, 755 P.2d 1095, 1097 (Alaska 1988)) (internal quotation marks omitted). *See also Trs. for Alaska*, 736 P.2d at 327 ("[T]he trifle is the basis for standing and the principle supplies the motivation." (quoting *Wagstaff v. Super. Ct., Family Ct. Div.*, 535 P.2d 1220, 1225 n.7 (Alaska 1975)) (internal quotation marks omitted).

[17]    *Friends of Willow Lake v. State, Dep't of Transp. & Pub. Facilities, Div. of Aviation & Airports*, 280 P.3d 542, 547 (Alaska 2012) (citing *Trs. for Alaska*, 736 P.2d at 327).

children and grandchildren are able to touch and see them as she has.

. . . .

14.    . . . Years ago, beluga whales used to come into nearby Kachemak Bay but now they no longer come. Katherine [Dolma] has not seen the whales in Kachemak Bay and fears that, due to the careless ways of the older generations, she and her generation will not have the joy of seeing the whales.

. . . .

17.    Ananda [Rose Ahtahkee Lankard] and her family and others in the Eyak community have been personally affected by climate change due to erosion from ice melt and flooding from increased temperatures, as well as the forests dying.  In the past decade there have been numerous floods in Alaska and Cordova, Ananda's traditional homelands. These floods, melting glaciers, dying forests and increased temperatures threaten Ananda's village, wild Copper River salmon and other food sources, native traditions, culture, and livelihood.

18.    . . . [Ananda] has seen glaciers receding, decline of wild salmon stocks in the Copper River and Prince William Sound, the loss of salmon habitat and the decline of animals.  Alaska is very important to Ananda because it is essential to her family's history, traditions and culture.

. . . .

21.    Avery and Owen [Mozen] think global warming is bad because the North Pole is melting.  It used to be huge and now it is tiny.  The polar bears now have to swim a long ways to get food.  It has also caused the glacier that they live next to, the Kennicott Glacier, to shrink.  It used to be a lot bigger which makes Avery and Owen sad.

Accepting these allegations as true and drawing all reasonable inferences in the plaintiffs' favor, as courts are required to do on a motion to dismiss,[18] we conclude that the complaint shows direct injury to a range of recognizable interests. Especially in light of our broad interpretation of standing and our policy of promoting citizen access to the courts,[19] the plaintiffs' allegations are sufficient to establish standing.

### 2. The plaintiffs' standing is not lost by the fact that climate change affects other people as well.

The State argues that "[a] standing requirement that does not distinguish Plaintiffs from any other person in Alaska is no requirement at all." In support, it cites *Center for Biological Diversity v. United States Department of the Interior*, quoting the federal court's observation in that case that "climate change is a harm that is shared by humanity at large, and the redress that Petitioners seek — to prevent an increase in global temperature — is not focused any more on these petitioners than it is on the remainder of the world's population."[20] The court in *Center for Biological Diversity* concluded that "Petitioners' alleged injury is too generalized to establish standing."[21]

We find *Center for Biological Diversity* inapt for several reasons. First, the plaintiff in that case was a public interest organization that had failed to "allege anywhere that it ha[d] suffered its own individual harm apart from the general harm caused by climate change, and its derivative effects on [its] members."[22] Here, the plaintiffs allege individual harm; all Alaskans cannot claim the same degree of injury as Kanuk, for

---

[18] *See, e.g., J & S Servs., Inc. v. Tomter*, 139 P.3d 544, 547 (Alaska 2006).

[19] *See, e.g., Trs. for Alaska*, 736 P.2d at 327.

[20] 563 F.3d 466, 478 (D.C. Cir. 2009).

[21] *Id.*

[22] *Id.* at 477. *See also id.* at 478 ("Petitioners have not established either the injury or causation element of standing.").

example, whose family is alleged to have had to evacuate its home because of climate change. Second, the court in *Center for Biological Diversity* was applying the more stringent federal standing requirements; Alaska's courts are more accessible to its citizens.[23] And finally, even federal law recognizes that denying injured persons standing on grounds that others are also injured — effectively preventing judicial redress for the most widespread injury solely because it is widespread — is perverse public policy.[24]

The same policy concern applies to the State's claim that the case should be dismissed because all Alaskans are indispensable parties and it is not feasible to join them all under Alaska Civil Rule 19 ("Joinder of Persons Needed for Just Adjudication"). Rule 19(a) provides that persons must be joined as parties if in their absence "complete relief cannot be accorded among those already parties"; or if the absent persons' interests will suffer in a practical way if they are not joined; or if their absence will "leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." The State contends that other Alaskans may disagree with the plaintiffs' requests in this case that greenhouse gases be reduced by six percent annually: some

---

[23] *Compare, e.g.*, *Larson v. State, Dep't of Corr.*, 284 P.3d 1, 12 (Alaska 2012) ("[T]he degree of injury to interest need not be great: an identifiable trifle is enough for standing to fight out a question of principle." (quoting *Bowers Office Prods., Inc. v. Univ. of Alaska*, 755 P.2d 1095, 1097 (Alaska 1988)) (internal quotation marks omitted), *with Biological Diversity*, 563 F.3d at 477 ("In order for a petitioner to establish standing, a petitioner must demonstrate that it has suffered a concrete and particularized injury that is caused by, or fairly traceable to, the act challenged in the litigation and redressable by the court.").

[24] *See Massachusetts v. EPA*, 549 U.S. 497, 522 (2007) ("That these climate-change risks are 'widely shared' does not minimize Massachusetts' interest in the outcome of this litigation.").

Alaskans may believe that number to be too high, others too low, and only if all Alaskans are joined can all their viewpoints be represented. The State also contends that it may be exposed to inconsistent obligations, since a decision in this case will not collaterally estop other plaintiffs from bringing similar cases in the future seeking the imposition of different standards.

The plaintiffs counter that if the State's position were accepted, "no lawsuit could ever be filed concerning any matter of public interest, . . . and most environmental litigation would be prohibited." The plaintiffs' argument has merit. Lawsuits that challenge regulatory standards — whether governing emissions levels, the number of harvestable salmon, the distance of required setbacks, or high school test scores — often argue for standards not favored by all Alaskans. To join all Alaskans in every suit that involves challenges to state law and policy would be "impractical and unnecessarily burdensome."[25] And to require dismissal of such lawsuits because all possible viewpoints cannot be represented would create unacceptable barriers to the courts. The State does not direct us to any cases that have applied Rule 19(b) to require dismissal in such a context, and we decline to do so here.

---

[25] *See Martinez v. Clark Cnty., Nev.*, 846 F .Supp. 2d 1131, 1148-49 (D. Nev. 2012) (in a case involving constitutional challenge to state law requiring that holders of certificates to perform marriages have a religious affiliation, finding no "case law requiring a plaintiff who challenges the constitutionality of a statute to join everyone conceivably impacted by a declaration that the statute is unconstitutional. . . . Although Rule 19 arguably favors joinder of certificate holders in this case, the Court finds it impractical and unnecessarily burdensome to require Plaintiffs to join every other person who conceivably may be affected by a declaration that the challenged law is unconstitutional"); *see also B.B.P. Corp. v. Carroll*, 760 P.2d 519, 525 (Alaska 1988) ("To require all residents of a subdivision to be parties to any lawsuit raising an issue of abandonment of a covenant would place a heavy burden on the courts and on the parties.").

Finally, the State claims that the plaintiffs lack standing to sue the State because they do not allege that it is the State that caused them harm; according to the State, the plaintiffs acknowledge instead that climate change is a global problem caused by carbon emissions worldwide. But the complaint does allege a duty on the State's part and breach of that duty: it seeks a declaration that the State "has an affirmative and fiduciary duty to protect and preserve the atmosphere as a commonly shared public trust resource for present and future generations of Alaskans under [a]rticle VIII of the Alaska Constitution" and alleges that the State has breached this duty by "fail[ing] to ensure the protection and preservation of [the State's] atmospheric resource from the impacts of climate change." Assuming the existence of a fiduciary duty on the part of the State to protect a public resource, the duty would not seem to depend on the source of the threatened harm.[26] Under our well-established doctrine of interest-injury standing, the plaintiffs have standing to bring suit against the State on the claims alleged in their complaint.[27]

---

[26] *See Massachusetts v. EPA*, 549 U.S. at 523 ("EPA does not dispute the existence of a causal connection between manmade greenhouse gas emissions and global warming. At a minimum, therefore, EPA's refusal to regulate such emissions 'contributes' to Massachusetts' injuries."); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) ("[T]he fact that 'climate change is largely a global phenomenon that includes actions that are outside of [the agency's] control . . . does not release the agency from the duty of assessing the effects of *its* actions on global warming within the context of other actions that also affect global warming.' " (quoting petitioners' brief with approval; emphasis by the court)).

[27] The State's reliance on *Neese v. Lithia Chrysler Jeep of Anchorage, Inc.*, 210 P.3d 1213, 1219 (Alaska 2009), for the proposition that "the plaintiffs lacked standing to sue [defendants] that caused them no harm," is misplaced. The auto dealerships in *Neese* owed no duty to plaintiff consumers with whom they had done no business. The State, conversely, owes duties to all its citizens.

**B.      The Plaintiffs' Suit Is Not Barred By Sovereign Immunity.**

The State contends that the plaintiffs' claims are based in tort law and are therefore barred by the doctrine of sovereign immunity. Alaska Statute 09.50.250(1) grants the State immunity from a suit that "is an action for tort, and [is] based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused." This statute does not bar the plaintiffs' claims. The duty the State is alleged to have breached, according to the complaint, is a fiduciary duty based on article VIII of the Constitution and the public trust doctrine, not tort law.

The State cites *Brady v. State*,[28] contending that in that case we "held that the State enjoyed sovereign immunity from a tort claim very similar to the one brought by Plaintiffs." But *Brady* is distinguishable. In that case the State's policy response to a beetle epidemic, decimating forests across Alaska, prompted the plaintiffs to bring a number of claims against the State and its officials.[29] Relevant here is the plaintiffs' claim in *Brady* that "the State's failure to staunch the beetle epidemic render[ed] it liable in negligence, in equity as a trustee who has allowed waste of the trust corpus, and under forest-protection statutes."[30] Finding that policymaking with regard to forest management was a discretionary function,[31] we held that sovereign immunity barred the plaintiffs' tort claims.[32] But we did not, as the State here argues, hold that the plaintiffs'

---

[28]      965 P.2d 1 (Alaska 1998).

[29]      *Id.* at 5-6.

[30]      *Id.* at 16.

[31]      *Id.*

[32]      *Id.* at 17 ("We thus conclude that the State is immune from the Bradys' tort claims regarding its management of its forests and response to the beetle epidemic.").

-13-                                                                                      **6953**

public trust argument stemmed from tort law, or that sovereign immunity barred the public trust claim.[33]  Instead, we rejected the public trust argument because there was no legal support for the specific relief the plaintiffs sought:

> The Bradys offer no authority for their argument that, since the State holds public lands as a "trustee" under Alaska's Public Trust Doctrine, and since a private trustee can be subject to an accounting to the beneficiaries for allowing waste of the trust corpus, the State can thus by analogy be liable *in damages* under the Public Trust Doctrine for letting beetles destroy the arboreal corpus of the public trust. The Bradys point to no opinion applying the Public Trust Doctrine thus.[34]

In this case, the plaintiffs' public trust claims requested only declaratory and equitable relief — not damages — and *Brady* does not control.  *Brady* cannot reasonably be read as holding that violations of the public trust doctrine are without remedy, as the State would have it.  We conclude that the plaintiffs' suit is not barred by sovereign immunity.

### C.     Of The Plaintiffs' Claims, Some Are Justiciable Under The Political Question Doctrine And Some Are Not.

Deciding whether a claim is justiciable depends on the answers to several questions.  These include (1) whether deciding the claim would require us to answer questions that are better directed to the legislative or executive branches of government (the "political question" doctrine),[35] and (2) whether there are other reasons — such as

---

[33]     *See id.* at 16-17.

[34]     *Id.* at 17 (emphasis in original).

[35]     *See Alaska Wildlife Alliance v. State*, 74 P.3d 201, 207 (Alaska 2003) (noting that "in *Baker v. Carr*[, 369 U.S. 186, 198 (1962)] the United States Supreme Court classified the political question doctrine as an issue of justiciability").

ripeness, mootness, or standing — that persuade us that, though the case is one we are institutionally capable of deciding, prudence counsels that we not do so.[36]

"[T]he established principle that courts should not attempt to adjudicate 'political questions' . . . stems primarily from the separation of powers doctrine," particularly "the relationship between the judiciary and the coordinate branches of the . . . Government."[37] But "merely characterizing a case as political in nature will [not] render it immune from judicial scrutiny."[38] Drawing exact boundaries between the political and the justiciable is not possible,[39] but we come as close as we can by applying the test announced by the United States Supreme Court in *Baker v. Carr*.[40] In *Baker* the Supreme Court listed six elements, one or more of which will be "prominent on the surface" of any case involving a political question:

---

[36] *See McDonnell v. State Farm Mut. Auto. Ins. Co.*, 299 P.3d 715, 724 (Alaska 2013) ("A justiciable controversy is one that is not hypothetical, abstract, academic, or moot."); *State v. Am. Civil Liberties Union of Alaska*, 204 P.3d 364, 368-69 (Alaska 2009) ("We have similarly recognized that a case is justiciable only if it has matured to a point that warrants decision.").

[37] *Abood v. League of Women Voters of Alaska*, 743 P.2d 333, 336 (Alaska 1987) (quoting *Malone v. Meekins*, 650 P.2d 351, 356 (Alaska 1982); *Baker v. Carr*, 369 U.S. 186, 210 (1962)) (internal quotation marks omitted).

[38] *Malone*, 650 P.2d at 356.

[39] *State, Dep't of Natural Res. v. Tongass Conservation Soc'y*, 931 P.2d 1016, 1018 (Alaska 1997); *see also League of Women Voters*, 743 P.2d at 336 ("Justiciability is of course not a legal concept with a fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures, including the appropriateness of the issues for decision . . . and the actual hardship to the litigants of denying them the relief sought." (quoting *Poe v. Ullman*, 367 U.S. 497, 508-09 (1961)) (internal quotation marks omitted)).

[40] 369 U.S. at 217; *see, e.g.*, *Tongass Conservation*, 931 P.2d at 1018; *League of Women Voters*, 743 P.2d at 336; *Malone*, 650 P.2d at 356-57.

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.[41]

"Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence."[42]

Applying the *Baker* inquiry and conducting de novo review,[43] we hold that the superior court was correct in concluding that three of the plaintiffs' claims were non-justiciable; but it erred when it relied on the same grounds to dismiss the other four claims.

> **1.    Three of the plaintiffs' claims are non-justiciable because they involve policy questions that fall within the competence of other branches of government.**

Among the plaintiffs' claims in this case are requests that the superior court (1) declare that the State's obligation to protect the atmosphere be "dictated by best available science and that said science requires carbon dioxide emissions to peak in 2012 and be reduced by at least 6% each year until 2050"; (2) order the State to reduce

---

[41]     *Baker*, 369 U.S. at 217.

[42]     *Id.*

[43]     *State, Dep't of Corr. v. Heisey*, 271 P.3d 1082, 1085 (Alaska 2012) (citing *Bradshaw v. State, Dep't of Admin., Div. of Motor Vehicles*, 224 P.3d 118, 122 (Alaska 2010)).

emissions "by at least 6% per year from 2013 through at least 2050"; and (3) order the State "to prepare a full and accurate accounting of Alaska's current carbon dioxide emissions and to do so annually thereafter."  We conclude that these three claims are non-justiciable under several of the *Baker* factors, most obviously the third:  "the impossibility of deciding [them] without an initial policy determination of a kind clearly for nonjudicial discretion."[44]

The United States Supreme Court has clarified that the *Baker* factors are to be applied in light of the purpose of the political question doctrine, which is to "exclude[] from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."[45]  In line with that purpose, the Ninth Circuit has observed that the third *Baker* factor is implicated "when, to resolve a dispute, the court must make a policy judgment of a legislative nature, rather than resolving the dispute through legal and factual analysis."[46]  While the science of anthropogenic climate change is compelling,[47] government reaction to the problem implicates realms of public policy

---

[44]    *Baker*, 369 U.S. at 217.

[45]    *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

[46]    *Equal Emp't Opportunity Comm'n v. Peabody W. Coal Co.*, 400 F.3d 774, 784 (9th Cir. 2005).

[47]    *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 523 (2007) (noting that "EPA does not dispute the existence of a causal connection between manmade greenhouse gas emissions and global warming"); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1214 (9th Cir. 2008) (noting that "NHTSA does not dispute that . . . 'fuel economy improvements could have a significant impact on the rate of CO2 accumulation in the atmosphere,' which would affect climate change"); INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, CLIMATE CHANGE 2013: THE PHYSICAL SCIENCE BASIS, SUMMARY FOR POLICYMAKERS 15 (Thomas F. Stocker

(continued...)

besides the objectively scientific. The legislature — or an executive agency entrusted with rule-making authority in this area — may decide that employment, resource development, power generation, health, culture, or other economic and social interests militate against implementing what the plaintiffs term the "best available science" in order to combat climate change. In 2007 Governor Sarah Palin created an Alaska Climate Change Sub-Cabinet that acknowledged the serious effects of climate change on communities and resources throughout the state and sought input from advisory groups about mitigating the causes of climate change and adapting to its unavoidable effects.[48] While there is nothing in the record that would reflect progress on these issues at the state level since 2009, when the advisory groups first made their recommendations,[49] we note that federal agencies, too, have been specifically entrusted

---

[47](...continued) et al. eds., 2013), *available at* http://www.ipcc.ch/report/ar5/wg1/ docs/WGIAR5_SPM_brochure_en.pdf ("It is *extremely likely* that more than half of the observed increase in global average surface temperature from 1951 to 2010 was caused by the anthropogenic increase in greenhouse gas concentrations and other anthropogenic forcings together." (emphasis in original)); William R. L. Anderegg, et al., *Expert Credibility in Climate Change*, 107 P.N.A.S. 12107, 12107-09 (2010), *available at* http://www.pnas.org/content/107/27/12107.full.pdf (surveying the publication and citation data of 1,372 climate researchers and concluding that 97-98% of those most actively publishing in the field recognize significant human contribution to climate change).

[48] *See* GOVERNOR SARAH PALIN'S REPORT ON THE CLIMATE CHANGE SUB-CABINET (July 2008), *available at* http://www.climatechange.alaska.gov/docs govrpt_jul08.pdf.

[49] *See* ALASKA CLIMATE CHANGE STRATEGY'S MITIGATION ADVISORY GROUP, FINAL REPORT: GREENHOUSE GAS INVENTORY AND FORECAST AND POLICY RECOMMENDATIONS ADDRESSING GREENHOUSE GAS REDUCTION IN ALASKA (Aug. 2009), *available at* http://www.climatechange.alaska.gov/mit/O97F21995.pdf; IMMEDIATE ACTION WORKGROUP, RECOMMENDATION TO THE GOVERNOR'S SUBCABINET (continued...)

with the task of addressing climate change and are developing "goals" and "guidelines" for the states to follow.[50] We cannot say that an executive or legislative body that weighs the benefits and detriments to the public and then opts for an approach that differs from the plaintiffs' proposed "best available science" would be wrong as a matter of law, nor can we hasten the regulatory process by imposing our own judicially created scientific standards.[51] The underlying policy choices are not ours to make in the first instance.

In *American Electric Power Co. v. Connecticut* ("*AEP*"), the United States Supreme Court reviewed nuisance claims brought against certain major emitters of carbon dioxide, claims the district court had dismissed as non-justiciable.[52] Like the plaintiffs here, the plaintiffs in *AEP* had asked the court to issue "a decree setting carbon-dioxide emissions for each defendant at an initial cap, to be further reduced annually."[53]

---

[49](...continued) ON CLIMATE CHANGE (Mar. 2009), *available at* http://www.climatechange.alaska.gov/docs/iaw_finalrpt_12mar09.pdf.

[50] *See* Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 79 Fed. Reg. 34830 (proposed June 18, 2014) (to be codified at 40 C.F.R. pt. 60) ("[T]he EPA is proposing state-specific rate-based goals for carbon dioxide emissions from the power sector, as well as guidelines for states to follow in developing plans to achieve the state-specific goals."); *id.* at 34868 (showing proposed state goals for Alaska).

[51] *See Svitak ex rel. Svitak v. State*, No. 69710-2-1, 2013 WL 6632124, at *2 (Wash. App. Dec. 16, 2013) (noting in a similar case that the plaintiff "wants this court to accelerate the pace and extend greenhouse gas reduction by ruling that the State has a fiduciary duty to protect and preserve the atmosphere from harm due to climate change" but that the underlying public policy questions are committed to legislative authority).

[52] 131 S. Ct. 2527, 2534 (2011).

[53] *Id.* at 2532.

Concluding that the claims fell under the discretion of the Environmental Protection Agency, the Supreme Court explained why the courts should therefore hold back:

> The appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum: as with other questions of national or international policy, informed assessment of competing interests is required. Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance.
>
> . . . .
>
> EPA [is] best suited to serve as primary regulator of greenhouse gas emissions. The expert agency is surely better equipped to do the job than individual district judges issuing ad hoc, case-by-case injunctions. Federal judges lack the scientific, economic, and technological resources an agency can utilize in coping with issues of this order. Judges may not commission scientific studies or convene groups of experts for advice, or issue rules under notice-and-comment procedures inviting input by any interested person, or seek the counsel of regulators in the States where the defendants are located. Rather, judges are confined by a record comprising the evidence the parties present.[54]

This court, too, "lack[s] the scientific, economic, and technological resources an agency can utilize"; we too "are confined by [the] record" and "may not commission scientific studies or convene groups of experts for advice, or issue rules under notice-and-comment procedures." The limited institutional role of the judiciary supports a conclusion that the science- and policy-based inquiry here is better reserved for executive-branch agencies or the legislature, just as in *AEP* the inquiry was better reserved for the EPA. The superior court thus did not err when it concluded that three of the plaintiffs' claims — (1) that the State's duty to protect the atmosphere is "dictated by best available science," (2) that "best available science" requires annual reductions of 6% in the State's

---

    **54**    *Id.* at 2539-40 (citation omitted).

carbon dioxide emissions until 2050, and (3) that the State must annually account for carbon dioxide emissions statewide — should be dismissed as non-justiciable.

### 2. The plaintiffs' claims for a declaratory judgment on the nature of the public trust doctrine do not present political questions.

The plaintiffs' remaining four claims, however, are for relief of the sort that is within the institutional competence of the judiciary: a declaratory judgment that (1) "the atmosphere is a public trust resource under [a]rticle VIII"; (2) the State therefore "has an affirmative fiduciary obligation to protect and preserve" it; (3) the State's duty is "enforceable by citizen beneficiaries of the public trust"; and (4) with regard to the atmosphere, the State "has failed to uphold its fiduciary obligation."

Our case law traces the public trust doctrine to "historic common law principles governing the sovereign's authority over management of fish, wildlife and water resources," principles our framers "constitutionalized" in Alaska's common use clause, article VIII, section 3: "Whenever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use."[55] "We have frequently compared the state's duties as set forth in [a]rticle VIII to a trust-like relationship in which the state holds natural resources such as fish, wildlife, and water in 'trust' for the benefit of all Alaskans."[56] While "[a]rticle VIII does not explicitly create a public trust[,] . . . we have used the analogy of a public trust to describe the nature of the state's duties with respect to wildlife and other natural resources meant for common use."[57]

---

[55] *Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 494 (Alaska 1988).

[56] *Brooks v. Wright*, 971 P.2d 1025, 1031 (Alaska 1999) (citing *McDowell v. State*, 785 P.2d 1, 18 (Alaska 1989); *Herscher v. State, Dep't of Commerce*, 568 P.2d 996, 1002-03 (Alaska 1977)).

[57] *Id.* at 1033.

That we interpret the public trust doctrine in a constitutional context is thus well established. The *Baker* factors for identifying non-justiciable issues do not apply to judicial interpretations of the constitution.[58] Indeed, "[u]nder Alaska's constitutional structure of government, 'the judicial branch . . . has the constitutionally mandated duty to ensure compliance with the provisions of the Alaska Constitution.' "[59] In this case, therefore, the plaintiffs' claims seeking primarily an interpretation of article VIII and the public trust doctrine do not present non-justiciable political questions.

In *Baxley v. State* we observed: "The public trust doctrine provides that the State holds certain resources (such as wildlife, minerals, and water rights) in trust for public use, 'and that government owes a fiduciary duty to manage such resources for the common good of the public as beneficiary.' "[60] We thus described the content of the trust, the State's duty as trustee, and the public's status as beneficiary — reflecting three of the plaintiffs' claims for declaratory relief in this case. And in *State v. Weiss* we held that the State had breached its fiduciary duty as trustee when it commingled public trust lands with general grant lands (though the public trust at issue was one expressly created by

---

[58]    Specifically, (1) the Alaska Constitution does not commit the task of constitutional interpretation to another branch; (2) there are obvious judicial standards for constitutional construction; (3) constitutional construction does not require policy determinations that fall under nonjudicial discretion; (4) it is quite possible for a court to reach an independent resolution of a constitutional question without expressing disrespect to the other branches; (5) constitutional issues should not entail an unusual need for unquestioning adherence to political decisions, in fact the opposite; and (6) because no other branch of government is charged with the task of interpreting the constitution, there is no risk of conflicting interpretations from other branches.

[59]    *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 913 (Alaska 2001) (quoting *Malone v. Meekins*, 650 P.2d 351, 356 (Alaska 1982)).

[60]    958 P.2d 422, 434 (Alaska 1998) (quoting *McDowell*, 785 P.2d at 16 n.9 (Rabinowitz, J., dissenting)).

federal law, not the public trust implied from constitutional principles).[61]  Whether the

State has breached a legal duty is a question we are well equipped to answer — assuming

the extent of the State's duty can be judicially determined in the first place.[62]

**D.** **The Claims For Declaratory Relief, Though Justiciable Under The Political Question Doctrine, Should Nonetheless Have Been Dismissed On Prudential Grounds.**

As noted above, the justiciability of a claim for declaratory relief requires

more than the conclusion under *Baker v. Carr* that the case does not involve a political

question; also required is an "actual controversy," one that "is appropriate for judicial

determination" because it is "definite and concrete, touching the legal relations of parties

having adverse legal interests. . . .  It must be a real and substantial controversy admitting

of specific relief through a decree of a conclusive character, as distinguished from an

---

[61]    706 P.2d 681, 684 (Alaska 1985).  Our use of common-law trust principles to define the State's duty in *Weiss* — as we have done in other cases involving the public trust doctrine implied from article VIII — further illustrates the justiciability of the claims in such cases:  the courts have the traditional tools, from the constitution or the common law, to decide them.  *Cf. Brooks*, 971 P.2d at 1033 (rejecting "the wholesale application of private trust law principles to the trust-like relationship described in [a]rticle VIII [as] inappropriate and potentially antithetical to the goals of conservation and universal use").

[62]    Other courts have recently reached the same conclusion about the justiciability of these issues in cases involving similar claims. *See Chernaik v. Kitzhaber*, 328 P.3d 799, 804-08 (Or. App. 2014) (holding that request for declaratory judgment on whether atmosphere is subject to the public trust is justiciable, and remanding to the trial court to make that determination in the first instance); *Butler ex rel Peshlakai v. Brewer*, No. 1 CA CV 12-0347, 2013 WL 1091209, at *5 (Ariz. App. Mar. 14, 2013) ("Not only is it within the power of the judiciary to determine the threshold question of whether a particular resource is a part of the public trust subject to the Doctrine, but the courts must also determine whether based on the facts there has been a breach of the trust.").

opinion advising what the law would be upon a hypothetical state of facts."[63]  The remaining issue for us to address, therefore, is whether the plaintiffs' claims for declaratory judgment — absent the prospect of any concrete relief — still present an "actual controversy" that is appropriate for our determination.  We conclude they do not.

The Alaska Declaratory Judgment Act[64] gives superior courts "the power to issue declaratory judgments in cases of actual controversy,"[65] and Alaska Civil Rule 57(a) governs declaratory judgment procedure;[66] both were intended to parallel their federal counterparts, and we therefore interpret them in light of pertinent federal authority.[67] Under federal law, "[d]eclaratory relief is a nonobligatory remedy," and the district courts therefore have "an opportunity, rather than a duty," to grant declaratory relief.[68]  "In the declaratory judgment context, . . . the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise

---

[63]     *Jefferson v. Asplund*, 458 P.2d 995, 998-99 (Alaska 1969) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)).

[64]     AS 22.10.020(g) provides, in part:  "In case of an actual controversy in the state, the superior court, upon the filing of an appropriate pleading, may declare the rights and legal relations of an interested party seeking the declaration, whether or not further relief is or could be sought."

[65]     *Brause v. State, Dep't of Health & Soc. Servs., Bureau of Vital Statistics*, 21 P.3d 357, 358 (Alaska 2001).

[66]     Civil Rule 57(a) provides, in part:  "The procedure for obtaining a declaratory judgment pursuant to statute shall be in accordance with these rules . . . . The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate."

[67]     *Lowell v. Hayes*, 117 P.3d 745, 755 (Alaska 2005).

[68]     *Id.* at 756 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995)) (internal quotation marks omitted).

judicial administration."[69] And "[a] court that 'know[s] at the commencement of litigation that it will exercise its broad statutory discretion to decline declaratory relief[]' need not undertake a 'wasteful expenditure of judicial resources' in 'the futile exercise of hearing a case on the merits first.' "[70]  These prudential considerations guide our courts.

We recognize that in this case the superior court did not rely on prudential grounds when it dismissed the plaintiffs' claims for declaratory relief; rather than exercising the discretion available to it, the court dismissed the entire lawsuit on political question grounds, which was error.[71]  Ordinarily, "a trial court's failure to exercise available discretion amounts to an abuse of that discretion."[72]  In *State v. American Civil Liberties Union of Alaska*, however, we clarified that when a superior court's decision whether to grant declaratory relief depends on prudential grounds such as ripeness, we review the decision de novo, because "this court is the ultimate arbiter of such issues."[73] Whether the superior court exercised its available discretion is thus irrelevant to our review.

---

[69]     *Id.* (quoting *Wilton*, 515 U.S. at 288) (internal quotation marks omitted).

[70]     *Id.* (quoting *Wilton*, 515 U.S. at 287-88) (first alteration in original).

[71]     "The decision to dismiss a suit because it involves a nonjusticiable political question is a question of law, subject to independent review."  *N. Kenai Peninsula Rd. Maint. Serv. Area v. Kenai Peninsula Borough*, 850 P.2d 636, 639 (Alaska 1993).

[72]     *Snyder v. Am. Legion Spenard Post No. 28*, 119 P.3d 996, 1004 (Alaska 2005) (Bryner, J., dissenting); *see also Alaska Ctr. for the Env't v. Rue*, 95 P.3d 924, 932 (Alaska 2004) (holding that commissioner's refusal to consider discretionary alternatives available to him, because of an erroneous reading of the governing statutes, amounted to an abuse of discretion).

[73]     204 P.3d 364, 368 (Alaska 2009) (citing *Jacob v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 177 P.3d 1181, 1184 (Alaska 2008)).

We discussed prudential grounds for declining to grant declaratory relief in *Lowell v. Hayes*.[74] We noted that "an action for declaratory relief is procedural and remedial, not substantive," and that "[d]eclaratory judgments vindicate substantive rights — they do not create them."[75] We emphasized "that declaratory judgments are rendered to clarify and settle legal relations, and to 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding,' " and we stated that "[a] court should decline to render declaratory relief when neither of these results can be accomplished."[76]

Applying these criteria here militates against granting the declaratory relief that the plaintiffs request. First, their request for a judgment that the State "has failed to uphold its fiduciary obligations" with regard to the atmosphere cannot be granted once the court has declined, on political question grounds, to determine precisely what those obligations entail. As for the remaining claims — that the atmosphere is an asset of the public trust, with the State as trustee and the public as beneficiaries[77] — the plaintiffs do make a good case. The Alaska Legislature has already intimated that the State acts as

---

[74]   117 P.3d at 754.

[75]   *Id.* at 757 (citing *Jefferson v. Asplund*, 458 P.2d 995, 997 (Alaska 1969)).

[76]   *Id.* at 755 (quoting *Jefferson*, 458 P.2d at 997-98); *see also* CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2759 at 543 (3d ed. 1998) (quoting EDWIN BORCHARD, DECLARATORY JUDGMENTS 299 (2d ed. 1941)).

[77]   If the atmosphere is subject to the public trust doctrine, then the roles of the State and the public as trustee and beneficiaries, respectively, necessarily follow by definition. *See Baxley v. State*, 958 P.2d 422, 434 (Alaska 1998) ("The public trust doctrine provides that the State holds certain resources (such as wildlife, minerals, and water rights) in trust for public use, 'and that government owes a fiduciary duty to manage such resources for the common good of the public as beneficiary.' " (quoting *McDowell v. State*, 785 P.2d 1, 16 n.9 (Alaska 1989) (Rabinowitz, J., dissenting))).

trustee with regard to the air just as it does with regard to other natural resources.[78]  We note, however, that our past application of public trust principles has been as a restraint on the State's ability to restrict public access to public resources, not as a theory for compelling regulation of those resources, as the plaintiffs seek to use it here.[79]

---

[78]	The legislature declared in AS 46.03.010(b) that it is "the policy of the state . . . to develop and manage the basic resources of water, land, *and air* to the end that the state may fulfill *its responsibility as trustee of the environment for the present and future generations*."  (Emphasis added.)  AS 46.03.010(a) similarly provides — albeit without using trust language — that "[i]t is the policy of the state to conserve, improve, and protect its natural resources and environment and control water, land, and air pollution, in order to enhance the health, safety, and welfare of the people of the state and their overall economic and social well-being."  Other courts have found similar statements to manifest the public trust doctrine.  *Save Ourselves, Inc. v. La. Envtl. Control Comm'n*, 452 So. 2d 1152, 1157 (La. 1984) ("The public trust doctrine was continued by the 1974 Louisiana Constitution, which specifically lists air and water as natural resources, commands protection, conservation and replenishment of them insofar as possible and consistent with [the] health, safety and welfare of the people, and mandates the legislature to enact laws to implement this policy."); *see Parks v. Cooper*, 676 N.W.2d 823, 838 (S.D. 2004) ("[W]e find the public trust doctrine manifested in the South Dakota[] Environmental Protection Act, authorizing legal action to protect 'the air, water and other natural resources and the public trust therein from pollution, impairment or destruction.' ").

[79]	*See, e.g.*, *State, Dep't of Natural Res. v. Alaska Riverways, Inc.*, 232 P.3d 1203, 1211 (Alaska 2010) ("The right to wharf out, like all riparian rights, is not absolute, but is limited by the state's exercise of its authority under the public trust doctrine."); *CWC Fisheries, Inc. v. Bunker*, 755 P.2d 1115, 1121 (Alaska 1988) ("We hold that tidelands conveyed to private parties . . . were conveyed subject to the public's right to utilize those tidelands for purposes of navigation, commerce and fishery."); *see also Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 496 (Alaska 1988) ("[W]e conclude that the common use clause was intended to engraft in our constitution certain trust principles guaranteeing access to the fish, wildlife and water resources of the state.  The proceedings of the Constitutional Convention, together with the common law tradition on which the delegates built, convince us that a minimum requirement of this duty is a prohibition against any monopolistic grants or special privileges."); *but see*

(continued...)

Although declaring the atmosphere to be subject to the public trust doctrine could serve to clarify the legal relations at issue, it would certainly not "settle" them. It would have no immediate impact on greenhouse gas emissions in Alaska, it would not compel the State to take any particular action, nor would it protect the plaintiffs from the injuries they allege in their complaint. Declaratory relief would not tell the State what it needs to do in order to satisfy its trust duties and thus avoid future litigation; conversely it would not provide the plaintiffs any certain basis on which to determine in the future whether the State has breached its duties as trustee. In short, the declaratory judgment sought by the plaintiffs would not significantly advance the goals of "terminat[ing] and afford[ing] relief from the uncertainty, insecurity, and controversy giving rise to the proceeding" and would thus fail to serve the principal prudential goals of declaratory relief.[80]

We observed in *Lowell* that the plaintiff's lack of effective "coercive remedies" (such as an action for damages) may support the issuance of declaratory relief instead;[81] but the plaintiffs' lack of a damage remedy in this case does not lead to the same conclusion. A purpose of declaratory relief is to allow the parties to avoid future litigation in which they would have to seek more coercive remedies. Declaratory relief "permits actual controversies to be settled before they ripen into violations of law or a breach of contractual duty and it helps avoid a multiplicity of actions by affording an adequate,

---

[79](...continued)
*Butler ex rel. Peshlakai v. Brewer*, No. 1 CA CV 12-0347, 2013 WL 1091209, at *7 (Ariz. App. Mar. 14, 2013) (rejecting similar claims under Arizona law in part because the plaintiff's "essential challenge is to state *inaction*," and state public trust precedent addresses only claims "that the state improperly disposed of a public trust resource" (emphasis in original)).

[80]     *See Lowell*, 117 P.3d at 755 (internal quotation marks omitted).

[81]     *Id.* at 756.

expedient, and inexpensive means for declaring in one action the rights and obligations of litigants."[82] As already noted, the declaratory relief the plaintiffs seek here would not serve these goals; it would not serve to declare expediently "in one action the rights and obligations of [the] litigants" and thus avoid further litigation. Within the very general framework of a public trust, "the rights and obligations of [the] litigants" with regard to the atmosphere would depend on further developments — by the legislature, by executive branch agencies, and through litigation focused on more immediate controversies.[83]

We also observe that if the plaintiffs are able to allege claims for affirmative relief in the future that are justiciable under the political question doctrine, they appear to have a basis on which to proceed even absent a declaration that the atmosphere is subject to the public trust doctrine. In their complaint they allege that the atmosphere is inextricably linked to the entire ecosystem, and that climate change is having a detrimental impact on already-recognized public trust resources such as water, shorelines, wildlife, and fish.[84] Allegations that the State has breached its duties with regard to the

---

[82] CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2751 at 457-58 (3d ed. 1998).

[83] *See* RESTATEMENT (THIRD) OF TRUSTS § 71 cmt. d (2007) (stating that although trust beneficiaries may apply to a court for instructions regarding trust administration, a court will not "instruct the trustee as to a question that may never arise, or that may arise only in the future, unless some need is shown for current resolution of the matter"); *but cf. Brooks v. Wright*, 971 P.2d 1025, 1031-33 (Alaska 1999) (rejecting "the wholesale application of private trust law principles to the trust-like relationship described in [a]rticle VIII [as] inappropriate and potentially antithetical to the goals of conservation and universal use," where private trust law principles could limit the influence of the public as beneficiaries).

[84] The State officially recognizes that "[t]he impacts of climate warming in Alaska are already occurring" and that "[t]hese impacts include coastal erosion, increased storm effects, sea ice retreat and permafrost melt." *Climate Change in Alaska*, STATE OF ALASKA, http://www.climatechange.alaska.gov/ (last visited July 25, 2014). These
(continued...)

management of these resources do not depend on a declaratory judgment about the atmosphere. In short, we are not convinced that declaratory relief on the scope of the public trust doctrine, as requested in this case, will advance the plaintiffs' interests any more than it will shape the future conduct of the State.

Concluding that there were valid prudential reasons to dismiss the plaintiffs' claims for declaratory judgment, we affirm the dismissal of their otherwise justiciable claims on that basis.[85]

## V.    CONCLUSION

We AFFIRM the superior court's dismissal of the plaintiffs' complaint.

---

[84](...continued) effects are explored in F. Stuart Chapin III et al., Chapter 22: *Alaska, in* CLIMATE CHANGE IMPACTS IN THE U.S.: THE THIRD NAT'L CLIMATE ASSESSMENT 514 (J. M. Melillo et al. eds., 2014,),*available at* http://nca2014.globalchange.gov system/files_force /downloads/low/NCA3_Full_Report_22_Alaska_LowRes.pdf.

[85]    *Irby v. Fairbanks Gold Mining, Inc.*, 203 P.3d 1138, 1142 (Alaska 2009) ("We can affirm a judgment on any appropriate basis, including grounds not relied on or raised in the lower tribunal.").